STATE OF LOUISIANA

VERSUS

E.M. III

NO. 22-KA-293

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-NINTH JUDICIAL DISTRICT COURT
PARISH OF ST. CHARLES, STATE OF LOUISIANA
NO. 18,443, DIVISION "E"
HONORABLE TIMOTHY S. MARCEL, JUDGE PRESIDING

February 27, 2023

**FREDERICKA HOMBERG WICKER**
**JUDGE**

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Hans J. Liljeberg

**CONVICTION AND SENTENCE AFFIRMED;**
**REMANDED WITH INSTRUCTION**
    **FHW**
    **SMC**
    **HJL**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Jalisa Walker
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLEE,
STATE OF LOUISIANA
     Honorable Joel T. Chaisson, II
     Louis G. Authement

COUNSEL FOR DEFENDANT/APPELLANT,
E.M. III
     Kevin V. Boshea

**WICKER, J.**

The defendant/appellant E.M. III[1] seeks appellate review of his sentence and conviction for sexual battery of a victim under the age of fifteen and at least three years younger than the offender, in violation of La. R.S. 14:43.1. For the following reasons, we affirm the defendant's conviction and sentence and remand the matter with instructions as it pertains to the defendant's sentence.

### FACTUAL BACKGROUND

In addition to the testimony of the victim, several immediate and extended family members testified at trial to the events leading to the State charging the defendant with sexual battery of A.C.

A.C., who was 17 at the time of trial, testified that she was born on May 27, 2004, and lived in Texas. She testified that the defendant is her stepfather's brother, and that she calls him "E. Bo." A.C. testified that the defendant would occasionally visit her family in Texas and would sometimes babysit her and her brother, J.M., when her parents would travel.

The weekend of July 4, 2018, 14 year-old A.C., her stepfather, and her brother were visiting family in Louisiana, while her mother remained in Texas for work. On July 7, 2018, A.C. and her family were to return to Texas. However, rather than drive through the night, A.C. testified that they decided to stay the night at her maternal great-uncle's house in Luling, Louisiana, where the defendant was living at the time.

---

[1] Pursuant to La. R.S. 46:1844(W)(3) and in the interest of protecting minor victims and victims of sexual offenses, this Court's published work will use only initials to identify the victim and any defendant or witness whose name can lead to the victim's identity (i.e., parent, sibling, or relative with the same last name as the victim). *State v. E.J.M., III*, 12-774 (La. App. 5 Cir. 5/23/13), 119 So. 3d 648, 652 n.1. *C.f., State v. R.W.B.*, 12-453 (La.12/4/12), 105 So.3d 54.

22-KA-293                                      1

Around 9:00 p.m. or 10:00 p.m., A.C.'s stepfather took A.C. and her brother to McDonald's for dinner. When they returned home, A.C. said her stepfather went to sleep on the couch, while she and her brother shared a bed in the room belonging to the defendant. A.C. recalled that she was watching a movie in bed, when at some point, the defendant entered the room to iron his clothes. A.C. also recalled her stepfather entering the room to take her brother, who was five years old at the time, to use the bathroom.

A.C.'s stepfather similarly testified that he had fallen asleep on the couch but woke up and went into the bedroom to take his son to the bathroom. A.C.'s stepfather testified that when he entered the room, his brother was ironing his clothes, his son was sleeping, and A.C. was awake in bed with her brother. A.C.'s stepfather recalled that the cover was over the children and that "A.C. had her legs and stuff all tangled up in J.M." After taking his son to the bathroom, A.C.'s stepfather returned to the couch and fell asleep.

Eventually, A.C. fell asleep. She testified that while she was sleeping, she suddenly felt a chill on her legs like the bed cover was removed. A.C. stated that she felt a hand rubbing her inner thigh. A.C. testified she then felt her shorts move, and a finger being inserted into her vagina. A.C. testified that it was at that moment she woke up. At trial, A.C. indicated that her brother was still sleeping at the time and that she jumped up in reaction to the defendant inserting his finger into her vagina. She stated that the defendant pushed her back down and told A.C., "shh." She testified that she told the defendant to stop, and she tried to push him back. A.C. stated that his finger was still inside her vagina, and he pushed his finger in harder. She described this as the "second time" he digitally penetrated her. She again told

the defendant to stop. She recalled that the defendant then noticed the bedroom door was open, so he went to close it. When he approached the bed, he tried to force her legs open. She told the defendant to stop and told him "this is called rape." A.C. told the defendant to leave her alone before she called the police. A.C. testified that the defendant told her that if she called the police, he would say that she was touching her brother inappropriately. According to A.C., the defendant then tried to force her legs open again as she told him to stop, and that it was rape. A.C. testified that the defendant then inserted his finger again a third time. When A.C. said "stop" louder, the defendant "backed off." At that point, the defendant sat on the corner of the bed and she told him she had to go to the bathroom. When she exited the bedroom, A.C. saw her stepfather sleeping on the couch, but she did not want to tell him what happened with the defendant. A.C. stated that she took her stepfather's cell phone, opened the door of the house, and exited the house.

A.C. then called her mother crying and told her that the defendant touched her. A.C. said her mom tried to calm her down and she then told her mother what happened. A.C.'s mother testified that around 1:20 or 1:30 a.m., she was awakened by a phone call from A.C. She testified that her daughter was crying hysterically and told her "Uncle Bo" was touching her inappropriately. A.C.'s mother asked A.C. where her stepfather was. A.C. indicated that her stepfather was sleeping and that she was outside on the porch behind the truck. A.C.'s mother continued to try to calm her daughter down and told A.C. to "go behind Ms. Kathy's house." She stated that her daughter was steadily crying and that she instructed her daughter to see if the shed was open. The victim's mother then told A.C. to go inside, put the phone on vibrate, and wait for her to call. A.C. explained she hid in the shed and

that her mother indicated she would call her sister, A.C.'s aunt, who lived nearby.

A.C.'s mother testified that after hanging up with her daughter, she immediately called her sister and explained to her that she needed to go to their uncle's house because A.C. had said that the defendant had touched her inappropriately. She then called her daughter back and informed her that A.C.'s aunt was on the way. A.C.'s mother testified that her sister called her when she arrived, which according to A.C. was three minutes later. A.C.'s mother testified that she then told A.C. to leave the shed, and she then resumed the call with her sister and heard "all kind of commotion."

At trial, A.C.'s aunt testified that upon arriving at her uncle's house, she observed the side door to the residence was open and saw A.C. come out of the laundry area. She described A.C. as scared and nervous. She stated that when she approached A.C., she saw the defendant come to the door. A.C.'s aunt asked him what he was doing and what he was looking for. The defendant told her that he was looking for A.C. because she said she was going to the bathroom, and it took a while. During this exchange, A.C.'s aunt instructed A.C. to wait inside the truck with her aunt's then-boyfriend. A.C.'s aunt accused the defendant of lying and asked why he was looking for A.C. The defendant again expressed that A.C. told him she was going to the bathroom, but he noticed the open door. A.C.'s aunt explained that at the time she confronted the defendant, her brother-in-law, A.C.'s stepfather, was sleeping on the couch, but that he awoke to the sounds of her and the defendant arguing.

At some point during this interaction, A.C.'s mother called her uncle, who had left A.C., her brother, stepfather, and the defendant at his house that evening to attend

a biker's function in Kenner, as well as her mother, A.C.'s grandmother. A.C.'s mother explained that they needed to go to the house immediately because A.C. had called her crying and told her that the defendant touched her inappropriately. A.C.'s mother then called her sister back.

At trial, A.C.'s stepfather testified that around 2:00 a.m. he awoke to his sister-in-law and his brother "cussing and fussing." He recalled his brother coming from the back of the house and assumed he was coming from the bedroom. A.C.'s aunt confronted the victim's stepfather asking him "how did he let this happen." Having just woken up, A.C.'s stepfather was confused and shocked. At some point during the argument, A.C.'s aunt returned to the truck to speak with A.C., who told her she was okay but was scared because the defendant had touched her. A.C. told her aunt that she "didn't want anyone to be mad at her." A.C.'s aunt testified that A.C. then recounted what happened in the bedroom with the defendant and used hand gestures to describe how the defendant had touched her.

A.C.'s stepfather then tried to approach the truck to speak with his stepdaughter, but she would not talk to him. A.C.'s aunt testified that she was on the phone with her sister and relayed to her what A.C. told her. A.C.'s stepfather testified that he did not speak to his brother about what was going on, but that at some point he heard "about A.C. touching [her brother.]" No one stated where A.C. allegedly touched her brother. He explained that he did not understand the context or what it meant at the time. Still, he testified that he was not concerned that she was accused of molesting her brother. As A.C.'s stepfather explained, A.C. and her brother had a close relationship and that she would get close to him; that she "liked to pick things off of her brother."

The victim's grandmother and great-uncle arrived at the house, both of whom testified at trial that upon their arrival they saw A.C. was visibly upset, crying and shaking. A.C.'s grandmother testified that she had never seen A.C. "the way she cried that night." She also testified that her granddaughter told her that the defendant touched her legs, and that he tried to "shush[] her to be quiet." She stated that her granddaughter told her she was able to leave the room after she told the defendant she needed to use the bathroom.

While A.C. remained in the truck with her aunt's boyfriend, the others, including A.C.'s mother via telephone, reconvened inside the house for, as A.C.'s aunt described, a "roundtable conversation" in the kitchen. A.C.'s grandmother testified that the defendant stood with his back to the kitchen sink and washed his hands while they talked. She testified that he paced between the sink and the door, and then went down the hall to the bathroom. A.C.'s grandmother recalled that while defendant was in the bathroom she could hear water flowing.[2] She testified that she observed the defendant wash his hands twice.

During the "roundtable conversation," the defendant gave his side of the story. A.C.'s aunt testified that the defendant said that A.C. was touching her brother and that he told her to stop. A.C.'s aunt further stated that the defendant denied touching A.C. but that the defendant "was adamant on A.C. was touching [her brother]." A.C.'s aunt testified that this was different from what he initially said to her and that his story changed. A.C.'s aunt relayed that while they talked, the defendant "just kept washing his hands." She clarified that she witnessed the defendant wash his

---

[2] A.C.'s great-uncle testified that he observed the defendant washing his hands in the bathroom without closing the door.

hands twice at the kitchen sink.

A.C.'s mother testified that the conversation lasted for quite some time. She explained to the jury that she "didn't want to jump the gun" and wanted to "take [her]self out of the equation." For that reason, she testified that she eventually called her daughter to ask her what she wanted to do. Her daughter told her that she thought the defendant should go to jail. When A.C.'s mother asked her if there was an alternative solution, A.C. suggested a restraining order. At trial, A.C.'s mother testified that she was surprised by her daughter's suggestion and did not think that the suggestion of a restraining order was something her daughter would have said. Because she did not recognize her daughter's response as something her child would say, she explained to her what would happen if they called the police. A.C.'s mother stated that she "strategically" explained the consequences of calling the police, "painting a picture" for her daughter. A.C.'s mother recalled thinking, "okay, let me tell her all these things because maybe, you know, she'll recant. …"

A.C.'s mother testified that her daughter is "[s]illy, more childlike, immature for her chronological age, happy, giddy." She stated that her daughter lies "like anybody else" but that she can give A.C. a look and then A.C. will change her story. She agreed that at times, her daughter will lie until she is confronted with evidence; however, she stated that her daughter does not have a reputation for untruthfulness. Further, she testified that her daughter did not recant the incident involving the defendant.

When A.C.'s mother explained to A.C. what would happen if the police were called, A.C.'s mother testified that she wanted her daughter to recognize the seriousness of the allegations. She stated that her daughter told her she understood.

A.C.'s mother further testified that her daughter had every opportunity to change her story but she did not. At that point, A.C.'s mother spoke with her husband, and they both agreed that something had happened and that they needed to do what was best for their daughter. Although A.C.'s mother urged her husband to make the call to police, he refused because he could not bring himself to report his brother's alleged misconduct. Therefore, A.C.'s aunt placed the call to 911 with A.C.'s mother on speaker using a separate cell phone.

Deputy Billy Cardwell arrived at the house at 4:40 a.m., and he first spoke with the victim's aunt, who reported the abuse. He then interviewed the victim, who was wearing shorts and a t-shirt and appeared worried and nervous. He testified that the victim "advised that her uncle was rubbing on her leg and forced himself onto her and stuck his finger inside her." Based on this information, the deputy located the defendant, Mirandized him, and proceeded to interview him. The defendant began to ask the deputy what happened but the deputy instead asked the defendant what he remembered. The defendant told Deputy Cardwell that A.C. was touching her brother inappropriately and he told her to stop, and that in reply A.C. told the defendant that she would "claim rape and call the cops." The defendant told the deputy that he asked A.C. why she would say that and that A.C. later went to the bathroom.

Detective Holly Laurent, a juvenile investigator for the St. Charles Parish Sheriff's Office, testified that she interviewed the victim at the Sheriff's Office headquarters. Detective Laurent testified that A.C. recounted the incident of abuse, which was consistent with the description of events that A.C. offered others. The detective described the victim as appearing "a little developmentally delayed and

immature." Detective Laurent confirmed that A.C. underwent a forensic medical examination at Children's Hospital the day after the incident and provided a consistent description of the abuse to medical personnel. Detective Laurent further testified that the victim reported to the examiner that she was experiencing pain inside of her vagina and that after the examination, the doctors noticed irritation at the opening of A.C.'s vagina.

After interviewing A.C., her brother, and her stepfather, Detective Laurent interviewed the defendant after he was advised of his *Miranda* rights. The defendant also consented to giving his DNA and indicated his willingness to take a polygraph test. However, because the interview was conducted on a Sunday, no polygraph examiner was available. Detective Laurent made attempts to schedule the test the next day, but the defendant did not answer or return the detective's calls. The detective later learned that the defendant had "packed up his belongings and went to an unknown location." At that point, the detective submitted a request for an arrest warrant.

Additionally, it was not until after the aforementioned incident of abuse allegedly took place and A.C. was meeting with the State's prosecutors that A.C. disclosed a prior incident of abuse involving the defendant that took place in Texas. During her direct examination, A.C. recounted what happened in the prior incident involving the defendant when she was in the seventh grade. A.C. testified that at the time, her parents were away traveling, and the defendant was babysitting her and her brother. She said she, her brother, and the defendant were at their house. The defendant asked her if she had basketball practice. When she told him that she did, the defendant told her that if she wanted him to bring her to practice, she would have

to let him touch her. A.C. explained that at the time, she did not understand what he was referring to. She then went to the bathroom, and the defendant stopped her from closing the door. He unbuttoned his pants and pulled them down. He told her to pull down her shorts, but she told him, "no." A.C. stated that he pulled down her shorts and leaned her over the sink. She testified that she saw his penis and that he "tried to insert it into [her] butt, but it wouldn't, like, fit because he tried a couple of times." She recalled telling him to stop and to leave her alone. He told her to be quiet and to hold still. A.C. indicated that he eventually pulled up his pants and walked out as he told her to clean herself up. She recalled sitting on the toilet in shock afterwards. A.C. testified that later, when he dropped her off for basketball practice, he threatened her.

A.C. testified that she did not disclose the prior incident to anyone until a month before trial. A.C. explained that she first disclosed the prior incident to the prosecutors because she was not comfortable with anyone else she spoke to and that she was still scared.[3] She also stated she did not tell her parents about it until after the prosecutor called her mom.[4]

Ashley Malone, a forensic DNA analysist at the Louisiana Crime Lab, was accepted as an expert in the field of forensic DNA analysis. She explained that depending on the source of the DNA, the strength of a DNA profile may vary. For

---

[3] Detective Laurent acknowledged that she was aware that A.C. subsequently disclosed an incident in Texas to the prosecutors that occurred prior to this offense. Detective Laurent stated the prior incident was not disclosed to her or anyone in the sheriff's office but that this did not surprise her. Captain Renee Kinler acknowledged that in the forensic interview, A.C. denied that anything prior had occurred with the defendant. Captain Kinler testified that it would not surprise her if A.C. made an additional disclosure about defendant.

[4] The victim's mother acknowledged that in January 2020, A.C. disclosed to the prosecutor a prior incident. A.C.'s mother stated she spoke to A.C. about that prior incident, but that her daughter was not forthcoming with information about it. Additionally, A.C.'s stepfather acknowledged that he heard through his family that A.C. accused the defendant of another incident. He later stated he heard a recording that his wife and A.C. made and that he listened to the recording on his wife's phone.

instance, she testified that the concentration levels of DNA found in blood cells are going to be higher than those found in skin cells. Ms. Malone further stated that contact DNA is less likely to provide a full DNA profile. Ms. Malone testified that for that reason, one would expect to have difficulty obtaining a good profile from the genital area or nearby areas in a digital penetration case.

Ms. Malone testified that she was the technical reviewer in this case involving A.C. and the defendant. Two reports were generated in relation to the case, and those reports were admitted into evidence. Ms. Malone testified that swabs from A.C.'s neck, ear, inner thigh, and left and right hand fingernails all showed two contributors. A.C. could not be excluded as the major contributor, and a valid DNA profile of the minor contributor could not be obtained. Ms. Malone stated the swab from the inner thigh underwent additional testing, after which the testing results suggested the possible presence of male DNA. She indicated, however, that "[they] were not able to obtain profiles to be able to make comparisons to. So because there was nothing to compare to, I could not make any exclusions. I…also [could not] make any inclusions…." Ms. Malone testified that she was not surprised by the results in this case given that the type of sample collected was contact DNA (i.e. skin cells) as opposed to semen or sperm, where it is expected to generate a full DNA profile. She also indicated that "time definitely [is] a factor" in the ability to obtain a full DNA profile. On cross-examination, Ms. Malone stated that she was not able to make any comparisons to say that the defendant's DNA was present.

Dr. Anne Troy, a forensic pediatric nurse practitioner with Children's Hospital, testified as an expert in child abuse pediatrics. She testified that she did not treat A.C., but she reviewed A.C.'s medical records. She relayed that A.C.

indicated she was digitally penetrated vaginally and that she hurt inside her vagina. Dr. Troy testified that the emergency room physician found redness to the opening of the victim's vagina. The expert doctor explained that the finding was "nonspecific but consistent" with the allegation of digital penetration and the victim's complaint of vaginal pain.

Dr. Troy generally discussed false allegations of sexual child abuse. She explained that research indicated that children deny sexual abuse even when there are diagnostic findings. Dr. Troy stated that research shows that when a child promises to tell the truth, there is a very low percentage that the child will give a false statement about sexual abuse. She testified that in a non-supportive environment, it is very normal for a child to say he or she "made it all up" at some point.

The defendant's sole witness at trial was his aunt. She stated that the last time she saw the defendant was at her sister's funeral in September 2019. The defendant's aunt testified that the defendant, the victim, and the victim's parents attended the funeral and repass. She stated that at the repass the defendant was serving gumbo and A.C. spoke to the defendant, asking him to make her a bowl of gumbo.

## PROCEDURAL HISTORY

On September 17, 2018, the State filed a bill of information charging the defendant with sexual battery of the victim A.C., who was under the age of fifteen and at least three years younger than the offender, in violation of La. R.S. 14:43.1. In February 2020, defendant filed a "Motion in Limine to Exclude Other Crimes, Opposition to State's Motion to Introduce Evidence of Similar Acts Pursuant to Article 412.2 and Memorandum in Support." The State then filed a "Notice of Intent

22-KA-293                                    12

to Introduce Evidence of Similar Crimes, Wrongs, And/Or Acts in Sex Offense Cases Pursuant to Louisiana Code of Evidence Article 412.2 With Motion To File Notice And Exhibits Under Seal." In August 2020, the trial judge excluded the Article 412.2 evidence, and the State objected to the ruling and sought supervisory review. In October 2020, this Court granted the State's writ application, reversed the trial court's ruling granting defendant's motion in limine to exclude other crimes evidence, and entered a ruling denying the motion in limine.[5]

A six-person jury trial was held in June 2021. A jury charge conference was also held wherein the responsive verdicts were discussed. On June 10, 2021, the jury unanimously found the defendant guilty as charged. Thereafter, the defendant filed motions for new trial and post-verdict judgment of acquittal. A hearing on the defendant's motions were held in July 2021. In August 2021, the trial court denied the motions.

Thereafter in December 2021, the trial court sentenced the defendant to five years imprisonment without hard labor and without the benefit of parole, probation, or suspension of sentence. The defendant was also ordered to register as a sex offender for twenty-five years. The defendant now files the instant appeal.

### DISCUSSION

On appellate review, the defendant raises the following assignments of error: (1) the verdict is contrary to the law and evidence; (2) the trial court erred in denying the motion for new trial; (3) the trial court erred in denying the motion for post-verdict judgment of acquittal; (4) the evidence of the alleged prior sexual activity admitted pursuant to La. C.E. 412.2 was admitted without the trial judge conducting

---

[5] *See State v. E.M., III*, 20-K-300 (La. App. 5 Cir. 10/21/20) (unpublished writ disposition).

the proper balancing test; and (5) the defendant was denied a fair trial by the omission of attempted sexual battery and misdemeanor sexual battery as a responsive verdict.

At the outset we address the manner in which the defendant presents his arguments in brief to this Court. Rather than individually brief assignments of error (1)-(3), the defendant's brief addresses these assigned errors together, as the merits of each pertains to the sufficiency of the evidence. We address the sufficiency of the evidence before turning to the defendant's remaining assignments of errors.

*Sufficiency of the Evidence*

The constitutional standard for sufficiency of the evidence is whether, upon viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could find that the State proved all of the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State v. Chinchilla*, 20-60 (La. App. 5 Cir. 12/23/20), 307 So.3d 1189, *writ denied*, 21-274 (La. 4/27/21), 314 So.3d 838, *cert. denied*, -- U.S. --, 142 S.Ct. 296, 211 L.Ed.2d 138 (2021). This directive that the evidence be viewed in the light most favorable to the prosecution requires the reviewing court to defer to the actual trier of fact's rational credibility calls, evidence weighing, and inference drawing. *State v. Clifton*, 17-538 (La. App. 5 Cir. 5/23/18), 248 So.3d 691, 702. This deference to the fact-finder does not permit a reviewing court to decide whether it believes a witness or whether the conviction is contrary to the weight of the evidence. *State v. McKinney*, 20-19 (La. App. 5 Cir. 11/4/20), 304 So.3d 1097, 1102. "Further, a reviewing court errs by substituting its appreciation of the evidence and the credibility of witnesses for that of the fact-finder and overturning a verdict on the

22-KA-293                                                                                   14

basis of an exculpatory hypothesis of innocence presented to, and rationally rejected by, the jury." *State v. Lane*, 20-181 (La. App. 5 Cir. 1/27/21), 310 So.3d 794, 804 (citing *State v. Alfaro*, 13-39 (La. App. 5 Cir. 10/30/13), 128 So.3d 515, 531). As a result, under the *Jackson* standard, a review of the record for sufficiency of the evidence does not require the reviewing court to determine whether the evidence at trial established guilt beyond a reasonable doubt, but whether, upon review of the whole record, any rational trier of fact would have found guilt beyond a reasonable doubt. *Id.*

In its determination of whether any rational trier of fact would have found the defendant guilty, a reviewing court will not re-evaluate the credibility of witnesses or re-weigh the evidence. *Lane*, 310 So.3d at 804. The credibility of a witness, including the victim, is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. *State v. Gonzalez*, 15-26 (La. App. 5 Cir. 8/25/15), 173 So.3d 1227, 1233. In the absence of internal contradiction or irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support a conviction. *Clifton*, 248 So.3d at 703. In sex offense cases, the testimony of the victim alone can be sufficient to establish the elements of a sexual offense, even when the State does not introduce medical, scientific, or physical evidence to prove the commission of the offense. *Id.*

Defendant in the instant case was convicted of sexual battery wherein the victim was under the age of fifteen and at least three years younger than the offender, in violation of La. R.S. 14:43.1.

La. R.S. 14:43.1 states in part:

A. Sexual battery is the intentional touching of the anus or genitals of the victim by the offender using any instrumentality or any part of the body of the offender, directly or through clothing, or the touching of the anus or genitals of the offender by the victim using any instrumentality or any part of the body of the victim, directly or through clothing, when any of the following occur:

(1) The offender acts without the consent of the victim.

(2) The victim has not yet attained fifteen years of age and is at least three years younger than the offender.

The defendant was charged with acting "without the consent of the victim, or where the other person has not yet attained fifteen years of age and is at least three years younger than the offender." The defendant does not contest on appeal that the State failed to prove any specified essential statutory elements of the crime for which he was convicted. Rather, the defendant specifically challenges his conviction on the basis of the victim's credibility.

A.C. testified that the defendant touched her legs while she was sleeping. She stated that she woke up to the defendant inserting his finger into her vagina and that she repeatedly told him, "no." She indicated that she repeatedly tried to push him away. A.C. testified that his finger was still in her vagina and that he pushed his finger in harder a second time. A.C. recalled again telling him to stop. She said he saw the door to the bedroom open and that he closed it. When he approached the bed, he tried to force her legs open. She again told him to stop.

A.C. stated she told the defendant that, "[t]his is called rape" and to leave her alone before she called the police. A.C. testified that he told her that if she called the police, he would say she was touching her brother inappropriately. She indicated he tried to force her legs open a second time. She again told him to stop and that it was rape. A.C. stated the defendant then inserted his finger into her vagina a third

time. A.C. testified that the defendant finally "backed off" when she told the defendant to "stop" louder than she previously had before.

A.C.'s retelling of the incident to family members, investigators, and medical personnel was consistent. Her testimony at trial was substantially similar to what she told her mother immediately after the incident. Detective Laurent said that A.C.'s statement to her was consistent with what A.C. told the deputy. Additionally, A.C.'s trial testimony was substantially similar to the recorded forensic interview that was played for the jury. Detective Laurent testified that the information conveyed in the forensic interview was consistent with the information A.C. told her but that it contained more detail. She also reviewed A.C.'s medical records and explained that A.C.'s statements to medical personnel were consistent with what A.C. told her. A.C.'s statements were also consistent with what she told her mother and aunt immediately after the incident.

A.C. stated she was in pain when she arrived at Children's Hospital and that her vagina was burning. A.C. also recalled being told by medical personnel that her vagina was bright red. Detective Laurent reviewed A.C.'s medical records. The detective explained that A.C. advised that she had pain in the inside of her vagina and that after the examination, the doctors saw irritation at the opening of her vagina. Dr. Troy stated she did not treat A.C. but that she reviewed her medical records. She relayed that A.C. "was digitally vaginally penetrated and hurt inside her vagina." Dr. Troy said the ER doctor found redness at the opening of the vagina. She explained that this finding was "nonspecific but consistent" with the allegation of digital penetration and a victim complaining of vaginal pain.

Finally, Ms. Malone's testimony reflects that swabs from A.C.'s neck, ear,

inner thigh, and left and right hand fingernails all showed two contributors. A.C. could not be excluded as the major contributor, and a valid DNA profile of the minor contributor could not be obtained. She indicated that the inner thigh swab contained male DNA, although she stated that she was unable to obtain a full profile in order to make any comparisons in this case. Additionally, A.C.'s aunt, grandmother, and great-uncle all testified that they witnessed the defendant wash his hands twice.

The State's witnesses also acknowledged that the defendant told them that the night of the incident A.C. inappropriately touched her younger brother, and when he told her to stop, A.C. told the defendant she would claim rape and call the police. A.C.'s father testified that when he initially heard his brother's explanation of what occurred in the bedroom, he was not concerned by the allegation, suggesting that he did not believe his brother's claim. Furthermore, members of A.C.'s family, including A.C. herself, testified that A.C. has a tendency to lie on occasion; however, everyone stated that A.C. was visibly upset the night of the incident, had a difficult time calming down, and that she appeared scared. Her mother testified that although she's lied in the past, she "strategically" explained the seriousness of the allegations to determine whether her daughter was telling the truth. A.C. testified that she recognized the seriousness of the allegations and that while she has lied in the past to get out of trouble, she has never lied about the incident involving the defendant.

The jury heard all the evidence and made a credibility determination. A.C.'s account of events remained consistent from her initial account immediately after the incident to her testimony at trial. A rational juror could have concluded based on the evidence and testimony presented, that the defendant digitally penetrated A.C. while A.C.'s brother lay asleep next to her, and only upon her telling him to stop

loud enough that the defendant likely grew concerned that she would alert someone's attention, did he "back off," as A.C. testified. Viewing the evidence in a light most favorable to the prosecution, a rational juror could have found beyond a reasonable doubt that the evidence was sufficient to sustain the conviction for sexual battery.

*Admissibility of Alleged Prior Sexual Act*

Defendant also claims that it was improper for this Court to grant the State's writ application, reversing the trial court's judgment granting the defendant's motion in limine, without also remanding the matter to the trial court to properly conduct the balancing test set forth in La. C.E. art. 403.

One month before trial, A.C. disclosed for the first time a prior incident that occurred in Texas. The defendant asserts that the State previously objected to providing the identity of those present during that disclosure at the district attorney's office, which prompted him to file a motion in limine. He states that the trial judge ordered the State to produce the notes of the meeting. Thereafter, the motion in limine was granted, but on supervisory review this Court reversed the trial court's ruling. The defendant asserts that this Court substituted its judgment for the judgment of the trial court and as a result prejudicial evidence was improperly admitted at trial, which he asserts was not harmless error.

In opposition, the State argues that after this Court's ruling on supervisory review, the defendant did not apply for rehearing with this Court or seek review by the Louisiana Supreme Court. The State provides that the defendant's trial counsel did not object during trial to any testimony regarding the prior incident. Therefore, the State argues that the issue was not preserved, and the defendant lacks standing to raise the issue on appeal. Furthermore, the State claims the law of the case

22-KA-293                                    19

doctrine now applies, and the defendant has not produced any evidence to show that this Court's ruling was patently erroneous or that it produced unjust results.

The State filed a notice of intent to introduce La. C.E. art. 412.2 evidence, which indicated its intent to introduce evidence through the victim's testimony that she was first sexually assaulted by defendant at her family home in Texas when she was in the seventh grade while defendant was babysitting her and her brother. The State said that during that prior incident, defendant bent the victim over the bathroom sink, attempted to pull her shorts down, and that the victim felt his penis graze her buttock. The State argued that the prior incident indicates a lustful disposition towards children and constitutes *res gestae* evidence. In the defendant's motion in limine, the defendant argued that the admission of the alleged prior incident would make it impossible for defendant to obtain a fair and impartial trial. He further asserted that reference to the other allegation would place defendant's character into evidence and would be reversible error. The defendant stated that the evidence fails to satisfy the balancing test set forth in La. C.E. art. 403. Additionally, the defendant claimed the evidence was not relevant and not *res gestae* evidence, and even if it was relevant, it does not satisfy La. C.E. art. 403.

The trial court issued its ruling, indicating that a two-step analysis was involved in deciding whether the probative value of the evidence outweighed its inherent prejudicial effect. As to the first step of determining whether the evidence had any probative value, the trial court stated that "[t]he content of the incident disclosed has probative value for indicating a lustful disposition." The trial court then addressed the second prong of the analysis, which it stated "requires the Court

to make a determination whether there is sufficient evidence -- whether sufficient evidence is presented…to find -- to support finding the defendant committed the alleged other wrong act -- wrong act or crime." The trial court found the evidence insufficient to support a finding that the defendant committed the alleged act, and granted the defendant's motion in limine to exclude introduction of the prior act at trial.

On supervisory review, this Court found that the trial court applied the incorrect legal analysis when it considered the sufficiency of the State's evidence regarding the prior act as part of the balancing test under La. C.E. art. 403. This Court also determined that even if the trial court intended to consider whether the State provided sufficient evidence independently from the balancing test, the trial court abused its discretion by finding that the evidence presented by the State was insufficient to establish that the defendant committed the prior act. Finding that the trial court committed legal error, this Court considered the admissibility of the disputed evidence *de novo* and applied the balancing test set forth in La. C.E. art. 403. We concluded that the probative value of the disputed evidence was not substantially outweighed by unfair prejudice and reversed the trial court's judgment granting the defendant's motion in limine.

In support of his argument that this Court erred in applying the balancing test without first remanding the matter to the trial court, the defendant cites *State v. Fife*, 19-1833 (La. 1/28/20), 288 So.3d 117. In *Fife*, the defendant timely sought writs with the Louisiana Supreme Court after the appellate court applied the balancing test in the first instance without remanding the matter to the trial court to apply the correct balancing test. The Louisiana Supreme Court found that the

appellate court "erred in applying the balancing test" without first remanding the matter to the trial court; therefore, the Supreme Court vacated the portion of the appellate court's ruling that found the probative value of the evidence did not substantially outweigh the danger of unfair prejudice and remanded the matter to the trial court to apply the balancing test under La. C.E. art. 403. *Id.*

The instant matter is distinguishable. The trial court in *Fife* failed to conduct the two-prong balancing test provided by La. C.E. art. 403; whereas, in this case, despite the trial court applying the incorrect legal analysis, the balancing test was performed nonetheless. Therefore, *Fife* is inapplicable.

Under the "law of the case" doctrine, an appellate court will generally decline to consider its own rulings of law on a subsequent appeal in the same case. *State v. Allen*, 17-685 (La. App. 5 Cir. 5/16/18), 247 So.3d 179, 185, *writ denied*, 18-1042 (La. 11/5/18), 255 So.3d 998. Reconsideration of a prior ruling is warranted when, in light of a subsequent trial record, it is apparent that the determination was patently erroneous and produced unjust results. *State v. Falcon*, 13-849 (La. App. 5 Cir. 3/12/14), 138 So.3d 79, 87-88, *writ denied*, 14-769 (La. 11/14/14), 152 So.3d 877.

In rendering its prior writ disposition, this Court reviewed the writ application, exhibits, and hearing transcripts and found that the trial court erred by conducting a separate and independent sufficiency test as part of the balancing test. The defendant raises the same issue now on appeal. Additionally, the defendant's brief does not allege any new facts or additional case law that would suggest that this Court's previous determination was patently erroneous or produced unjust results. *See State v. Falcon*, 13-849 (La. App. 5 Cir. 3/12/14), 138

So.3d 79, 87-88, *writ denied*, 14-769 (La. 11/14/14), 152 So.3d 877.  We find the defendant has not shown that reconsideration is warranted or that our prior determination was patently erroneous or produced unjust results.

Furthermore, any error regarding the admission of the other crimes evidence is subject to the harmless error rule.  *State v. Merritt*, 04-204 (La. App. 5 Cir. 6/29/04), 877 So.2d 1079, 1087, *writ denied*, 04-1849 (La. 11/24/04), 888 So.2d 228.  The test for determining if an error was harmless is whether the verdict rendered at trial was surely unattributable to the error.  *State v. Joseph*, 16-349 (La. App. 5 Cir. 12/14/16), 208 So.3d 1036, 1047-48, *writ denied*, 17-77 (La. 4/7/17), 218 So.3d 109.  Even without testimony regarding the prior incident in Texas, this Court finds the evidence was sufficient to prove the defendant's guilt as to the sexual battery of A.C.   Therefore, we find any error regarding the admission of the other crimes evidence was harmless.

*Responsive Verdicts*

Lastly, the defendant assigns as error the trial court's failure to include attempted felony sexual battery and misdemeanor sexual battery as responsive verdicts for the jury's consideration.

A jury charge conference was held in this case, wherein the defendant's trial counsel sought to have "guilty of attempted sexual battery" included as a responsive verdict.  The State disagreed and stated that the only verdicts permitted on the verdict form were guilty and not guilty of the charged offense. The trial court agreed with the State and asked defense counsel if she "had something that tells [him] otherwise."  Defense counsel replied, "Only the criminal jury instructions and procedures."  She then objected.  The trial court later instructed

the jury that there were no lesser-included offenses for sexual battery and that the responsive verdicts were guilty or not guilty.

On appeal, the defendant claims that the responsive verdicts should have included both attempted felony sexual battery and misdemeanor sexual battery. However, the defendant failed to raise at the trial court level an argument related to the inclusion of misdemeanor sexual battery as a responsive verdict. Because appellate courts will not consider issues raised for the first time on appeal, we find the defendant did not preserve this issue for appeal. *State v. Revish*, 19-1732 (La. 10/20/20), 340 So.3d 864, 868 (quoting *Segura v. Frank*, 93-1271 (La. 1/14/94), 630 So.2d 714, 725). Therefore, we are precluded from considering it here.

Nevertheless, we find defense counsel preserved the issue as it relates to the trial court's exclusion of attempted sexual battery as a responsive verdict. "An accused in Louisiana is entitled to have the trial court instruct the jury on the law of the charged offense and on all responsive offenses." *State v. Serio*, 94-131 (La. App. 5 Cir. 6/30/94), 641 So.2d 604, 607, *writ denied*, 94-2025 (La. 12/16/94), 648 So.2d 388 (citing La. C.Cr.P. arts. 803, 814, 815). "When an accused requests and is refused an instruction on a lesser and included offense, or when the accused timely objects to the court's failure to give a responsive offense instruction to which defendant is statutorily entitled, the conviction may be reversed." *Id.* (citing *State ex rel. Elaire v. Blackburn*, 424 So.2d 246, 248 (La. 1982), *cert. denied*, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983)); *See also State v. Dufore*, 424 So.2d 256 (La. 1982).

In order for a conviction be reversed, the defendant must demonstrate that

the inclusion or exclusion of a responsive verdict was prejudicial and that fundamental due process has been violated. *State v. Preston*, 09-856 (La. App. 5 Cir. 5/25/10), 40 So.3d 1052, 1062, *writ denied*, 10-1492 (La. 1/14/11), 52 So.3d 900. In determining whether the failure to give a responsive verdict of attempt is reversible error, the question is whether there is a reasonable probability that, had the jury been given the responsive verdict of attempt, the verdict would have been different. *Serio*, 641 So.2d at 608.

Although the court must charge the jury of the law applicable to lesser-included offenses under La. C.Cr.P. art. 803, the charges must be pertinent—there must be evidence which would support a conviction of the lesser offenses. *Youngblood*, 274 So.3d at 742 (citing La. C.Cr.P. art. 807). The trial judge is required to charge the jury only with those charges of which the accused can be found guilty under the indictment and the evidence. *Id*. An erroneous jury charge is not prejudicial when the jury returns a verdict of guilty of the crime charged. *State v. Johnson*, 45,885 (La. App. 2 Cir. 1/26/11), 57 So.3d 412, 418, *writ denied sub nom. State ex rel. Johnson v. State*, 11-2765 (La. 10/12/12), 99 So.3d 36.

The State argues that the defendant's objection to the exclusion of the responsive verdict was insufficient to preserve the issue for appeal. La. C.Cr.P. art. 801 provides in pertinent part:

> A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.

In *Johnson*, *supra*, the defendant on appeal argued that the trial court

improperly failed to include two responsive verdicts. The Second Circuit stated that, contrary to the State's contention that the defendant failed to object to the exclusion of the responsive verdicts for one of the counts, the record showed that prior to the court's charge to the jury, defense counsel objected "to omitting any of the possible responsive verdicts as to the aggravated rape charges." The court found that the record did not indicate that the defendant waived the issue regarding exclusion of the responsive verdicts.

In this case, the transcript from the jury charge conference reflects that defense counsel sought inclusion of attempted sexual battery as a responsive verdict and relief based on "the criminal jury instructions and procedures." We find defense counsel timely objected to exclusion of the responsive verdict of attempted sexual battery during the jury charge conference. Nevertheless, this Court has considered the merits of a defendant's argument even if the contemporaneous objection was insufficient. *See State v. Carter*, 96-358 (La. App. 5 Cir. 11/26/96), 685 So.2d 346, 355 (considering responsive verdict issue despite the inability to determine if the defendant made a contemporaneous objection).

In the present case, the defendant failed to demonstrate that the exclusion of the responsive verdict was prejudicial, given that the jury returned a verdict of guilty as charged, which as we previously discussed is supported by sufficient evidence. *Id*. (citing *State v. Freeman*, 444 So.2d 243 (La. App. 1 Cir. 1983); *Johnson*, 57 So.3d at 418. We find no merit to this assignment of error.

*Error Patent*

A review of the record demonstrates two errors patent. La. R.S.

14:43.1(C)(1) states, "[w]hoever commits the crime of sexual battery shall be punished by imprisonment, with or without hard labor, without benefit of parole, probation, or suspension of sentence, for not more than ten years." The sentencing transcript reflects the trial judge stated the following: "[i]t is the sentence of this Court that you serve five years **without hard labor**, without the benefit of probation, parole or suspension of sentence." However, the sentencing minute entry reflects that the defendant was sentenced to five years "with the Dept. of Corrections without the benefit of probation, parole, or suspension." Additionally, the record contains the State of Louisiana Uniform Sentencing Commitment Order, which indicates the "Total Sentence Length" is "5 years w/o hard labor;" yet, the "Amount of Time in DPS&C Custody" reflects "5 years."

This Court has previously held that when a trial judge sentences a defendant to the custody of the "Department of Corrections" the sentence imposed is necessarily at hard labor. *State v. Jamison*, 17-49 (La. App. 5 Cir. 5/17/17), 222 So.3d 908, 909 n. 2. Additionally, "[w]here a discrepancy exists between the transcript and the minute entry, the transcript prevails." *Edwards v. State*, 19-187 (La. App. 5 Cir. 6/4/19), 2019 WL 2363530, * 2 (citing *State v. Lynch*, 441 So.2d 732 (La. 1983)). Therefore, we find the sentencing minute entry and the commitment order are inconsistent with the sentencing transcript and must be corrected.[6]

Additionally, the sentencing minute entry and transcript indicates that the

---

[6] Based on the record before this Court, it appears that the defendant is presently housed in the Department of Corrections despite the transcript reflecting his sentence was imposed without hard labor. The Pro Se Briefing Notice to Defendant included in the Appellant's brief reflects that the defendant's current address is at Rayburn Correctional Center.

trial court failed to advise the defendant that he has two years after the judgment of conviction and sentence become final to seek post-conviction relief pursuant to La. C.Cr.P. art. 930.8. "It is well settled that if a trial court fails to advise, or provides an incomplete advisal, pursuant to La. C.Cr.P. art. 930.8, the appellate court may correct this error by informing the defendant of the applicable prescriptive period for post-conviction relief by means of its opinion." *State v. Taylor*, 20-215 (La. App. 5 Cir. 4/28/21), 347 So.3d 1008, 1023.

Accordingly, we now advise the defendant, by way of this opinion, that no application for post-conviction relief, including applications that seek an out-of-time appeal, shall be considered if filed more than two years after the judgment of conviction and sentence has become final under the provisions of La. C.Cr.P. arts. 914 or 922.

## CONCLUSION

For the foregoing reasons, we affirm the defendant's conviction and sentence and remand the matter to the trial court for correction of the minute entry and commitment to accurately reflect the defendant's sentence as imposed by the trial judge at sentencing. Additionally, the Clerk of Court for the 40th Judicial District Court is ordered to transmit the commitment to the officer in charge of the institution to which relator has been sentenced and to the Department of Corrections' Legal Department.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED WITH INSTRUCTION**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
ROBERT A. CHAISSON
STEPHEN J. WINDHORST
HANS J. LILJEBERG
JOHN J. MOLAISON, JR.

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY **FEBRUARY 27, 2023** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
**CLERK OF COURT**

## 22-KA-293

**E-NOTIFIED**
29TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE TIMOTHY S. MARCEL (DISTRICT JUDGE)
GWENDOLYN K. BROWN (APPELLANT)      KEVIN V. BOSHEA (APPELLANT)

**MAILED**
WENDY J. WILLIAMS (APPELLANT)
ATTORNEY AT LAW
1308 PAUL MAILLARD ROAD
LULING, LA 70039

LOUIS G. AUTHEMENT (APPELLEE)
ATTORNEY AT LAW
13919 RIVER ROAD
SUITE 300
LULING, LA 70070

HON. HONORABLE JOEL T. CHAISSON, II
(APPELLEE)
DISTRICT ATTORNEY
TWENTY-NINTH JUDICIAL DISTRICT
COURT
POST OFFICE BOX 680
HAHNVILLE, LA 70057